JOHN FELTZ v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—81 S. W. (2d) 616.

Division Two, March 30, 1935.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Jesse T. Friday* for respondent.

COOLEY, C.—Action for damages for personal injuries. Verdict and judgment for plaintiff for $12,000; from which defendant appealed.

At and prior to the time of his injury plaintiff was employed by Bramstedt & Son, coal and material dealers, at Overland in St. Louis County, as a truck driver, his duties including the loading and unloading of the materials he hauled. He was injured by being thrown from his truck when it was struck at a highway crossing by

a train on defendant's railroad. The railroad at that point runs approximately north and south and crosses at grade a public highway called Edgar Avenue which runs approximately east and west. Bramstedt & Son's coal yard is adjacent to and north of the highway and adjacent to and west of the railroad. On the day of the accident plaintiff loaded his truck at the coal yard and drove it onto the scale platform to be weighed. While loading or while on the scales he saw the train south of the crossing backing northward toward the crossing and saw it stop with the northmost car, a steel gondola car, some four feet south of the south side of Edgar Avenue. Having weighed his loaded truck plaintiff drove into Edgar Avenue and turned east. He stopped with the front end of his truck six or seven feet west of the railroad track and looked southward along the train and track. He could not see the engine, which was at the south end of the train, because of a curve in the track, nor was any member of the train crew in sight. He then proceeded eastward. When the front wheels of his truck had about gotten over the east rail of the track the train, without signal or warning of any kind, moved northward. The gondola car struck plaintiff's truck on its right side just back of the cab and pushed it northward twenty or twenty-five feet, when it turned over on its side. Plaintiff was thrown out and received the injuries for which he sues. This appeal presents questions concerning an instruction given for the plaintiff, the admission of certain evidence and the alleged excessiveness of the verdict. Further facts bearing upon these questions respectively will be given in connection with the discussion thereof.

I. Plaintiff's petition alleged several specifications of primary negligence, viz., failure to give the statutory crossing signal by sounding the bell or whistle of the locomotive at least eighty rods from the crossing and thereafter until the crossing was passed, as required by Section 4756, Revised Statutes 1929 (Mo. Stat. Ann., p. 2133); negligently backing the train across the crossing without any signal or warning of intention so to do when defendant's servants knew or should have known that plaintiff was about to cross the track and might be injured by the unexpected and unheralded movement; and negligent failure to keep watch or lookout for persons on the highway approaching the crossing when by so doing plaintiff's peril could and would have been discovered and the collision averted. The petition also contained a charge of negligence under the humanitarian doctrine which, however, was not submitted to the jury. Each specification of primary negligence was submitted by separate instructions, each of which directed a verdict for plaintiff upon a finding of the facts therein hypothesized. Complaint is made only of Instruction No. 1, submitting failure to give the statutory crossing signals, which reads:

"The Court instructs the jury, that if you believe and find from the evidence, that on the 23rd day of September, 1930, Edgar Avenue, referred to in the evidence, was a public highway in the County of St. Louis, Missouri; and that the railroad track of the defendant crossed said Edgar Avenue at the place mentioned in the evidence, approximately in a northerly and southerly direction; and that the defendant's agents and servants were in charge of and operating the switch engine and train of cars, referred to in the evidence; and that defendant's said agents and servants caused said train of cars to be stopped on defendant's said track so that the last or northernmost car thereof was stopped and standing still several feet south of said Edgar Avenue, as described in the evidence; and while said train of cars was so stopped and standing still, if you so find, that the plaintiff operated the motor truck, referred to in the evidence, along said Edgar Avenue and upon said railroad track for the purpose of crossing the same;

"And if you further believe and find from the evidence, while plaintiff was operating said motor truck upon and across said track and along said Edgar Avenue, if you so find, that defendant's said agents and servants did then and there cause said train of cars to be moved backward in a northerly direction toward, upon and across said Edgar Avenue;

"And if you further believe and find from the evidence, before and at the time of causing said train of cars to be moved backward, as aforesaid, if you do so find, that defendant's said agents and servants neither rung the bell upon said engine nor sounded the steam whistle attached to said engine at least eighty (80) rods from the point on defendant's said track where said track crosses Edgar Avenue, and that defendant's said agents and servants neither kept said bell ringing nor sounded said steam whistle at intervals until said engine crossed said Edgar Avenue, then you are instructed that defendant's said agents and servants were guilty of negligence;

"And if you further believe and find from the evidence, that as a direct result of such negligence, if any, the rear car of said train was caused to collide with said motor truck, and that plaintiff was injured thereby, as mentioned in the evidence, and that at said time the plaintiff was exercising the highest degree of care for his own safety in the operation of said motor truck, then your verdict shall be in favor of the plaintiff and against the defendant."

It is argued that there was no evidence relative to the giving of a signal eighty rods from the crossing; that when the train first stopped the south end thereof, the engine, was less than that distance south of Edgar Avenue; that therefore the whistle could not have been sounded or the bell rung eighty rods from the crossing after the train had made the stop referred to and before beginning the backward movement that caught plaintiff; and that failure to

whistle or ring before that stop was made could not have been the proximate cause of the accident because plaintiff had admittedly seen the train moving northward before the stop, had seen it stop and knew where it was when he started to cross.

It is true there was no evidence relative to the giving or failure to give signals prior to the stop mentioned. All the evidence on that subject was directed to the failure to give a signal after that stop had been made and before the train again moved and backed over the crossing. The instruction was framed upon that theory. It hypothesizes that after the train had stopped with the northern-most car several feet (the evidence shows three and a half or four feet) south of Edgar Avenue, and while it was standing still, the plaintiff operated his truck along said highway and upon the track for the purpose of crossing; that while he so operated the truck the train was caused to move backward across the highway; and that "before and at the time" of so causing the train to move backward defendant's servants in charge thereof failed to give the statutory crossing signal at least eighty rods south of the crossing and continue same until the engine crossed the highway. It is also true that there was no evidence that the engine was as far as eighty rods south of the crossing when that stop was made. Plaintiff's evidence does not show the length of the train. Defendant's evidence shows it to have been about nine hundred feet. And, as stated, the north end of the train, which struck plaintiff, was only about four feet from the highway when the movement complained of began. Obviously the statutory crossing signals, under those circumstances, could not have been given eighty rods from the crossing. And we may concede also that under the facts of this case defendant is not to be held liable on the theory of failure to give the statutory crossing signal as the train was moving northward before the above-mentioned stop was made. The instruction is erroneous in the respect pointed out. Whether or not the error calls for reversal of the judgment is another matter. Some further facts should be stated in this connection.

There is an overhead bridge, called the Lackland Road bridge, 379 feet south of Edgar Avenue. The railroad track curves eastward south of Edgar Avenue. When the train stopped the engine was south of said bridge. Because of that situation, with the train between the engine and the crossing, the engineer and fireman could not see the Edgar Avenue crossing nor the highway immediately west of it. Defendant's evidence shows that no member of the crew was in position to see the crossing or the highway for some distance west of it, unless it was Mr. Gilbert, foreman in charge of the contemplated switching operation. He testified that he had alighted from the train, on the east side, about at the Lackland Road bridge, possibly just south of it, and was at that point, on the ground, when he gave the fireman the signal in response to which the train moved

backward over the crossing. He said that when he alighted he saw plaintiff's truck in the Bramstedt coal yard which, as we have stated, was just north of Edgar Avenue and immediately west of the railroad track; that the truck was then pointed in a southerly direction (which would be toward Edgar Avenue) and that while it seemed to him the truck was then standing still, it might have been moving slowly forward. Apparently he saw plaintiff no more until after the collision. He said that from his position he could see the crossing and to the *north* of Edgar Avenue, but he did not say that he could see Edgar Avenue west of the crossing, the side from which plaintiff approached, and from his testimony as to where he stood, 379 feet or more south of Edgar Avenue, on the east side of the train, the north end of which was only about four feet from that highway, it is clear that he could not see the highway west of the crossing. There was no one at or about the crossing to warn travelers on the highway of the contemplated movement of the train. Plaintiff's evidence was that no signal or warning was given. Defendant, although it called as witnesses several of the train crew, did not claim or attempt to prove that any signal or warning had been given. On the contrary, its only witness who testified on that point, McGowan, said there were no signals. On the record it must be taken as conceded that no signal or warning was given.

That defendant's servants were negligent, under the undisputed facts and circumstances, in backing the train without signal or warning over the crossing which travelers on the highway might at any moment be approaching, seems to us undeniable. And negligence on the part of defendant, while not actually admitted, was not seriously disputed at the trial. The record as a whole shows that the battle was waged chiefly if not entirely over the question of whether or not the plaintiff had been substantially injured and the nature and extent of his injuries.

In Herring v. Wabash Railroad Co., 80 Mo. App. 562, an instruction had been given authorizing a verdict for the plaintiff if the jury found that his injuries had been caused by the defendant's neglect to ring the bell of its engine at least eighty rods from the crossing at which the plaintiff had been struck and continuously thereafter until the train reached the crossing. It was argued against the instruction that the evidence failed to show that the engine, which was doing switch work, had been at any time as much as eighty rods from the crossing and hence the jury might have been misled in deeming it the duty of the defendant to ring its bell at an impossible distance. The court held that the statute, now Section 4756, supra, applied even though the engine, when it started, was less than eighty rods from the crossing it was about to traverse, and said, 80 Mo. App. l. c. 570:

"We do not think the jury could have been misled by the use of the statutory terms in the court's instruction, but that they took the

common sense view that the question submitted to them was, whether or not the bell was rung as the engine approached the crossing, and not whether or not the ringing began when the engine was eighty rods distant from the crossing."

In Spiller v. St. Louis, M. & S. Ry. Co., 112 Mo. App. 491, 87 S. W. 43, the plaintiff was injured on a public highway crossing by a backing train. It was held that the statutory warning should have been given notwithstanding that the train, when it started to move, was less than eighty rods from the crossing.

In the instant case the jury was required to and did find that plaintiff was himself in the exercise of due care. And since, as we have endeavored to show, defendant's negligence is indisputable, the verdict for plaintiff, so far as concerns the question of liability, is manifestly for the right party regardless of the error in said Instruction No. 1. The instruction might have been misleading and the error therein prejudicial if there was a question as to whether or not a signal or warning had been given before the train backed over the crossing after having stopped. But under the conceded facts and circumstances of this case we think such error was not prejudicial and would not warrant reversal of the judgment.

II. At the time of the collision a Mr. Matt Webb was with plaintiff in the truck. At the trial plaintiff was asked what happened to Matt Webb. Defendant's counsel objected, stating no grounds, the objection being merely: "Object to whatever happened to him." The objection was overruled and plaintiff answered: "He was mashed." Appellant charges error in the court's ruling for that the evidence adduced tended only to inflame the minds of the jury.

In Crockett v. K. C. Rys. Co. (Mo.), 243 S. W. 902, 907, it was held that testimony as to injuries to persons other than the plaintiff who were in an automobile at the time of the collision there in question was part of the *res gestae* and admissible to show the force of the collision. For similar reasons we think the evidence complained of in this case was properly admitted. Moreover, the objection, stating no grounds, was insufficient and, furthermore, it was shown by other testimony, introduced without objection, that Webb had received injuries from which he died. The evidence complained of could not have prejudiced defendant.

III. Complaint is made that the court erred in permitting two expert witnesses, Dr. Custer and Dr. Klinefelter, to be asked if, in their opinion, the injury plaintiff claimed to have received could have caused the conditions which he contended had resulted therefrom. Plaintiff's evidence tended to show that when he was thrown from the truck he received a violent blow on his back in the region of the left kidney, resulting in serious injury to that organ; that

following the injury blood appeared in his urine and inflammation, infection and a diseased condition developed. Dr. Custer, an expert on diseases of the urinary organs, treated plaintiff and was called by him as a witness. He described at length his treatments and examinations and the condition of plaintiff's kidney. He was then permitted to state, over defendant's objection, in answer to a hypothetical question, that in his opinion the conditions he found to exist could have been caused by the blow or injury hypothesized in the question. Similar testimony was elicited from Dr. Klinefelter who was defendant's witness. Defendant's contention is that it was not competent to ask the witnesses whether or not in their opinions the injury might or could have caused the conditions complained of and found to exist but that they could be asked only whether or not in their opinions it did cause such conditions. Defendant cites on this point Kimmie v. Terminal Railroad Association, 334 Mo. 576, 66 S. W. (2d) 561; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Cole v. Railroad, 332 Mo. 999, 61 S. W. (2d) 344. We do not understand those cases so to hold. They hold that, as stated in the Adelsberger case, 332 Mo. l. c. 959, 59 S. W. (2d) l. c. 646:

"Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause."

But that is not saying that testimony of an expert that a described injury could have caused the condition complained of is incompetent or of no probative value. The contrary is expressly stated in the Kimmie case where it is said, 334 Mo. l. c. 605, 66 S. W. (2d) l. c. 565:

"We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could or would produce a certain result. An expert's view of possibility or probability is often helpful and proper." (Citing authorities.)

In this case Dr. Custer's testimony did not stop with the expression of opinion that the conditions he found in plaintiff's kidney could have been caused by the injury. He testified further, in substance and effect, that in his opinion said conditions had been so caused. There was other evidence tending to support such conclusion.

The question propounded to Dr. Klinefelter, to which objection was made, was on cross-examination. On direct examination he had been interrogated by defendant's counsel as to whether or not certain conditions which he had observed in an X-ray picture of plaintiff's kidney *could* have been caused by trauma. Defendant seemed to be endeavoring to prove that plaintiff's condition could not have resulted from the injury. In view of Dr. Klinefelter's direct examination as well as for other reasons above mentioned we think the

cross-examination was competent. As to both these witnesses we think that no error was committed in admitting the testimony complained of.

IV. Lastly, appellant insists that the verdict is excessive. Plaintiff was injured September 23, 1930. The cause was tried April 18-20, 1932. Appellant in its brief thus summarizes plaintiff's testimony as to his injuries:

''As a result of the accident, plaintiff testified that he suffered a knot on the left side of his head, three or four inches above the left ear and about the size of a hen's egg, he also suffered a bruised shoulder. The left side of his back, above the waist-line, and in the region of the left kidney was injured. His left hip was sprained and bruised. His left leg below the knee was skinned and a knot formed from that. He is nervous, easily frightened, a little misdrive upsets him and he cannot sleep at nights. The left side of his head pains him from the front to the back. Prior to the accident he weighed 165 or 170 pounds but he lost weight to 117 pounds and in January, 1931, he weighed 132 pounds. After the accident he remained in bed 10 or 12 days, noticing blood in the urine. He went to the Missouri Baptist Hospital on October 9, 1930, and left on October 25, 1930. During his stay there Dr. Custer cystoscoped him. A cystoscope is an instrument to be inserted into the bladder and kidneys. It was left there for two or three days and it is very painful. At this time blood passed. The performance is still repeated except that the cystoscope is not left there. They would keep him on the table for about an hour cystoscoping him and that was done every three days. Upon going home he was up and down, partially in bed. He was then taken to the American Hospital where he remained for from 6 to 9 days, continuously confined to his bed. On December 20, 1930, he was again taken to the Missouri Baptist Hospital where he was confined to his bed from 30 to 35 days more, remaining until January 25, 1931. While there Dr. Poe gave him medicine for his kidney and for his temperature. Dr. Custer continued the treatment of cystoscoping him. Plaintiff says that never a day goes by but that he must rest some. He suffers pain in his back over his kidney. He also has suffered headaches. Whenever he is cystoscoped he always passes blood in the urine for a short while. The last time he was cystoscoped was on April 6, 1932. He has pain on the left side of his back in the region of the left kidney. His hip and his head pain him as well as his left shoulder. His shin pains and will get sore at times. He does not sleep well or soundly. His urination is painful, but it was not so prior to the accident. Prior to the accident he very seldom had a headache. He has done no work since September 23, 1930, because he is not able to do so.''

Appellant's summary is inaccurate as to plaintiff's weight. His testimony was that he weighed 117 pounds in January, 1931, and 132 pounds at the time of the trial. In addition to the foregoing the evidence on behalf of plaintiff tends to prove that immediately following his injury he suffered "excruciating" pain, requiring morphine, and that the cystoscoping operations, which were numerous, were so painful that at times they produced nausea and vomiting; that he had concussion of the brain when first taken to a doctor after his injury; that while there had been great improvement, as one doctor expressed it, "wonderful recovery," in the kidney conditions, that organ still showed decreased functioning and is probably permanently impaired and weakened, and that plaintiff will probably require further medical treatment; that he may never get well; that while he might be able to drive a truck he cannot do such work as loading and unloading same. One doctor testified in his opinion plaintiff "will always have trouble with his back," and his nervousness is of a permanent nature and that he will never be able to do heavy manual labor such as loading and unloading trucks. One doctor said he thought there was some permanent injury to plaintiff's hip. Plaintiff's evidence further tends to show that prior to his injury he was physically sound and well; that he had incurred obligations for medical and surgical treatment and hospital bills up to the time of the trial aggregating about $1645 and had lost in wages up to that time approximately $1960. He had been earning $24 a week prior to his injury and has been able to earn nothing since. He was forty-two years old at the time of his injury. Deducting his actual monetary loss up to the time of the trial the verdict gives plaintiff approximately $8400 to compensate him for the extreme and long continued pain he has endured, his impaired health and diminished earning power. And the evidence of medical witnesses indicates that he will probably continue to suffer pain and nervousness and be put to additional expense for medical treatment in the future as a result of his injuries.

Industrious counsel have cited a number of cases on this question. They present different states of facts not sufficiently similar to those of the instant case to justify, in our judgment, taking space to review them. Decided cases may be advisory on the question of excessiveness of verdict but it is impossible to lay down hard-and-fast rules respecting the amount of compensatory damages that will govern every case. Each case must be ruled on its own facts. We have given this question careful consideration and in our opinion the amount of the verdict is not beyond the bounds of reason or so large as to indicate passion or prejudice on the part of the jury. The judgment is affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.